## SHORT *v.* THE STATE.

1. The charge on the law of justifiable homicide, though not technically accurate, did not qualify the law respecting the defense of one's person against one who manifestly intends or endeavors by violence or surprise to commit a felony upon his person, as defined in the Penal Code, §§ 70, 71, by the principles contained in § 73 relating to the law of self-defense, and, under the facts of the case, was not cause for a new trial.
2. When considered in connection with its context and the entire charge, the following excerpt: "When the defendant claims that he acted upon the fears of a reasonable man that his life or person was in danger at the hands of the deceased, and that he really acted under those fears, and not in a spirit of revenge, the defense does not have to be proved beyond a reasonable doubt," is not cause for a new trial on the ground that it carries with it the implication that the burden is upon the defendant to prove self-defense.
3. "The doctrine of reasonable fear does not apply to any case of homicide where the danger apprehended is not urgent and pressing, or apparently so, at the time of the killing."
4. The evidence authorized a charge on the subject of conspiracy, and the instruction with reference thereto did not intimate an opinion as to the existence of a conspiracy between the defendant and the person indicted with him.

5. One can not create an emergency which renders it necessary for another to defend himself, and then take advantage of the effort of such other person to do so. This principle was applicable to the case, and the charge embodying it fairly conveyed it to the jury.

6. Where a defendant in his statement narrates events, circumstances, and communications as tending to imply that the decedent contemplated immoral relations with his wife, and the argument of counsel for the defendant, as well as that of the prosecution, in large part dealt with the so-called "unwritten law," it is not cause for a new trial that the court instructed the jury that though it would be justifiable for a husband to slay to prevent the debauchery of his wife, yet it would not be justifiable for him to kill in revenge of a past debauchery, or because the slayer had been told of improper and insulting advances made towards his wife, and that the jury should try the case according to the law given in charge by the court, and not according to what is commonly called "unwritten law," notwithstanding there was no evidence of adultery of the wife with the decedent.

7. Where the court charged the law of voluntary manslaughter as defined in the code, if the defendant desired an instruction applying any particular phase of voluntary manslaughter to the facts of the case, a timely and appropriate written request should have been submitted.

8. The jury had been deliberating over night, and the next morning the judge requested them to be brought into court, announcing his purpose to recharge them, and on objection from defendant's counsel the court delayed any instruction until the defendant, who was in jail, was brought into the court-room. The above occurrence did not amount to a proceeding in the trial of the case in the absence of the defendant.

9. Where the jury requests further instructions upon a particular phase of the case, the court in his discretion may recharge them in full, or only upon the point or points requested.

10. The evidence authorized the verdict, and no sufficient ground for new trial is made to appear.

NOVEMBER 11, 1913.

Indictment for murder. Before Judge Hawkins. Worth superior court. July 10, 1913.

The defendant, Alva F. Short, was jointly indicted with Linwood W. Lundy for the murder of J. Douglas Bass. The defendant was separately tried. The evidence introduced by the State tended to show that the decedent in company with J. R. Hill was walking down a street in Sylvester. They stopped at a drug-store, then proceeded down the street to the post-office, on the corner of the street and an alley. As decedent and Hill were almost in front of the post-office door, the defendant approached them and stated to the decedent that he wanted to see him. Decedent and defendant walked off together, turning down the alley. Hill entered the post-office to get his mail, and the firing began just as he was opening

his mail-box. The decedent was shot directly through the back of his head or neck, the powder burning the collar of his coat. He was also shot through the right breast and lower stomach. The defendant and Lundy were brothers-in-law. One witness testified, that five or six shots were fired before he came in view of the place of the tragedy; that at that time the decedent, whom he did not then know, was falling; that about the time decedent fell to the ground the defendant shot him twice; that Lundy was standing immediately by and at the side of the defendant, and the two walked off together. Another witness testified, that he was coming around the back way to the post-office and saw the shooting; that he first saw two men coming down the alley by the warehouse, arm in arm, when he heard a pistol fire at the back of them and looked up; another pistol then fired, and the decedent fell to the ground. The first shot that attracted the attention of this witness was from behind; there were two shots fired from behind, and the defendant shot the decedent while on his knees, and twice after he fell to the ground. Witness did not see the man who shot from behind, but immediately after the shooting saw Lundy, and saw him put his foot in decedent's face. He saw the decedent pull his pistol from his pocket after he had fallen and risen to his knees. An examination of the pistol of the decedent showed that it had not been discharged. The State contended that the killing was the result of alleged attentions by the decedent towards the defendant's wife, and that the defendant and Lundy had conspired to kill the decedent in the manner whereby it was done. Two letters were introduced in evidence, dated six days prior to the homicide, addressed to the decedent, and found in his pocket after he was killed. Their import was that "he" would be out of town, and requested the decedent to meet the writer at a secluded place. The letters were signed "you know," and requested an immediate reply to an assumed name. Witnesses testified that these letters were in the handwriting of the defendant. The jury convicted the defendant, and his motion for a new trial was denied.

*W. D. McNeil, J. H. Tipton, J. J. Forehand & Son,* and *M. A. Warren,* for plaintiff in error.

*T. S. Felder, attorney-general, R. C. Bell, solicitor-general, Little, Powell, Hooper & Goldstein, U. V. Whipple, G. R. Nottingham, Passmore & Hay,* and *Tison & Bell,* contra.

EVANS, P. J. (After stating the foregoing facts.)

1. In charging on the law of justifiable homicide the court read to the jury Penal Code §§ 70 and 71. He followed this with an elaboration of the principles of these two sections, explaining that the fears of the slayer must be those of a reasonably courageous man, that the sufficiency of the fears was to be passed on by the jury, and that if there should be a reasonable doubt that the defendant acted under such fears to prevent a felony from being perpetrated on his person he should be given the benefit of such reasonable doubt. The court then charged on the subject of conspiracy, following with this instruction on the law of self-defense: "If a person kill another in his defense, it must appear that the danger was so urgent and pressing at the time of the killing that in order to save his own life (or prevent a felony being committed upon his person) the killing of another was absolutely necessary; and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given. If you find that the defendant was surrounded by this urgent and pressing danger at the time of the killing, you will then inquire further: was the deceased the assailant, or did the defendant in good faith endeavor to decline any further struggle before the mortal blow was given? In order to make it justifiable homicide it must appear, first, that there was this urgent and pressing danger to the defendant at the time of the killing, and it must further appear that the person killed was the assailant, or that the defendant in good faith declined or endeavored to decline any further struggle before giving the mortal blow." The first sentence of this excerpt, except the clause embraced within parenthetical marks, is a literal reproduction of Penal Code § 73. The interpolation of the words included within parenthesis was improper. Was the defendant harmed thereby? It has been held that the court in his instructions on the law of justifiable homicide should not qualify the law of defense of property and person, as defined in §§ 70 and 71, with the principle contained in § 73. *Pugh* v. *State,* 114 *Ga.* 16 (39 S. E. 875). The court did not do this in the present instance. He charged the principle of §§ 70 and 71 in an instruction entirely disassociated from his instruction upon the law embraced in section 73. When charging on section 73 he did not limit or

qualify his charge on §§ 70 and 71, but merely interpolated a foreign matter which did not essentially change the law of self-defense as defined in § 73. Though the charge is not technically accurate, we do not think, in view of what has been said, and under the facts of this case, that a new trial should result on this account.

2. The jury were fully instructed that the burden was on the State to prove the defendant's guilt beyond a reasonable doubt. The excerpt quoted in the second headnote, when considered in connection with its context and the entire charge, is not cause for a new trial on the ground that it implied that the burden of proof was on the defendant to show that he acted in self-defense or in defense of his person.

3. It was not erroneous to charge: "The danger must be imminent or apparently so, and he must not kill upon an imaginary fear. He must have some justification, or some ground for such fear." *Tolbirt* v. *State,* 124 *Ga.* 767 (4), 768 (53 S. E. 327).

4. The two defendants were brothers-in-law. They were on the scene of the homicide at the time of its commission. There was evidence that both participated in it, and immediately after its commission they left together. The evidence authorized a charge on the subject of conspiracy, and the charge as given is not open to the criticism that the court expressed an opinion as to the existence of a conspiracy between the two defendants to take the life of the decedent.

5. The law is well settled that one can not create an emergency which renders it necessary for another to defend himself, and then take advantage of the effort of such other person to do so. *Price* v. *State,* 137 *Ga.* 71 (72 S. E. 908). The evidence tended to show that when the defendant accosted the decedent he put his arm in that of the decedent, and as they turned into the alley the defendant took his pistol from his pocket and while his arm was encircling the back of the decedent, with the muzzle of the pistol under the decedent's coat collar, fired a bullet into the back of his head. Other shots were fired, and decedent fell to his knees and attempted to defend his life by drawing his pistol and attempting to use it. But before he could use his pistol he was shot again and again by the defendant. If this was the truth of the case (and under the evidence the jury had the right to so find), the defendant could not rightly contend that his last shots were fired in self-defense. Crit-

icism is made of this language of the court: "Although a man's life may be in danger, yet if he is responsible for that danger, then the existence of the danger can not be urged as a defense to himself." It is insisted that this in effect amounts to an instruction that, without regard to the nature and extent of the provocation, if the defendant was responsible for the danger, he lost his right of self-defense. What the court meant (as clearly shown in the context) by the expression "danger" was an emergency which the defendant created, rendering it necessary for the decedent to defend himself. The quoted excerpt lacked technical accuracy of expression, but in its context was not calculated to mislead the jury. See *Roach* v. *State*, 34 *Ga.* 78, 84.

6. In his statement to the jury the defendant said that he had observed the decedent talking to his wife on several occasions, and that a certain person had informed him that the decedent was trying to create the impression that he was intimate with his wife. He further stated that his wife, a short time prior to the homicide, told him that in January preceding the homicide in April the decedent came by the defendant's house and spoke to his wife, who was pruning rose bushes in the front yard; that after some conversation the decedent requested a drink of water, and his wife went into the house to get the water; that as she was returning from the kitchen with the water she met the decedent in the dining-room and gave him the glass of water; that the decedent placed it on the table and said he didn't want water, but he wanted to talk to her and tell her how much he thought of her; that he tried to kiss her, but she repulsed him, and he left the house; and that subsequently he apologized to her for his conduct, but continued to show her attentions, which were discouraged by the wife. Beyond the reference to improper conduct by the decedent towards the defendant's wife, as contained in the statement of the prisoner, there is nothing in the record indicating the slightest impropriety of conduct on the part of the decedent towards the defendant's wife. It appears from a note of the presiding judge that the argument of counsel for the defendant and the State in large part dealt with the so-called "unwritten law," and in view of the defendant's statement and the argument of counsel he gave the instruction (to which exception is taken) in effect that though it would be justifiable for a husband to slay to prevent the debauchery of his wife, yet, it

would not be justifiable for him to kill in revenge of a past debauchery, or because the slayer had been told of improper and insulting advances made towards his wife; and that the jury should try the case according to the law given in charge by the court, and not according to what is commonly called "unwritten law." Under such circumstances we do not think the giving of such charge was cause for a new trial, notwithstanding there may have been no evidence of the adultery of defendant's wife with the decedent.

7. The court charged the jury the law of voluntary manslaughter as defined in the Penal Code, § 65. If the law concerning this grade of homicide was applicable, it was only made so by the defendant's statement. Complaint is made that the court should have made a concrete application of the law of manslaughter, and his failure to do so is assigned as error. It is immaterial to discuss whether under the defendant's statement a case of manslaughter is made, as the court gave him the benefit of the law respecting that grade of homicide, and the jury convicted him of the higher grade. If the defendant desired a concrete application of the law to any phase of the case as made by his statement, he should have preferred a timely and appropriate written request.

8. The jury had been deliberating over night, and the next morning the court, of his own motion, requested the sheriff to have them brought into the court-room, indicating his intention to give them further instructions on the law of the case. Upon announcement of the court's intention in this respect, counsel for the defendant strenuously objected to the court's giving the jury any further instructions. The court refrained from so doing until the defendant was brought into court. It is claimed that this occurrence amounted to a step in the procedure of a criminal trial in the absence of the defendant, who was confined in jail. There is no merit in this ground. All it amounts to is that the court expressed an intention to instruct the jury, and delayed carrying that intention into effect, on account of the protest of counsel, until the defendant was brought into court. This was no part of the procedure of the trial which required the defendant's presence.

9. In response to the court's inquiry, the foreman of the jury said they desired information on the law of self-defense and manslaughter. Whereupon the court said, "I will just give you a recharge in whole." The court then instructed them in full upon

the law of the case. The exception is that the court should not have instructed the jury upon any points pertaining to the case except those as to which further instructions were requested by the jury. We think that when further instruction as to a particular phase of the case is desired by the jury, it is a matter largely in the discretion of the court as to whether he shall confine his instructions to the point included within the request or should give them full instructions upon the case as a whole. We can not see how the defendant was hurt by the court's recharge of the whole law.

10. We have carefully examined the evidence, an epitome of which appears in the statement of facts. The verdict was authorized, and has the approval of the court; and no sufficient reason is made to appear why a new trial should be granted.

*Judgment affirmed. All the Justices concur.*