# LITTLE v. THE STATE.

1. Where the accused was on trial for the offense of murder, and the theory of the State was that the homicide was committed with malice aforethought, that the homicide was premeditated, and that the accused had sought the deceased and had armed himself with a pistol, evidence tending to show that the accused habitually or customarily carried a pistol was admissible, as it tended to rebut the theory of the State that the carrying of the pistol on the occasion in question was a part of the preparation which the accused had made for the slaying of the deceased.

2. The court properly repelled the evidence offered to show that the accused had made complaints as to the deceased having employed a laborer who was under contract of employment to the accused.

3. Under the evidence the law of voluntary manslaughter as contained in sections 64 and 65 of the Penal Code was involved, and so was the law of voluntary manslaughter as related to mutual combat.

4. Under the facts of this case it was error for the court to give in charge to the jury instructions which in effect imposed upon the defendant the burden of showing that the killing was justifiable unless the evidence in behalf of the State itself shows that the killing was justifiable, thereby excluding from a consideration by the jury of the rule, that, if the evidence shows that there were circumstances of mitigation or alleviation, the presumption that malice arises from the proof of the homicide would be rebutted.

5. In a proper case, on a trial of one indicted for murder, sections 70, 71, and 73 of the Penal Code may all be given in charge; but instructions as to the separate branches of the law of justifiable homicide should not be so given as to confuse the different defenses which may arise under those sections.

6. The other portion of the charge excepted to shows no error.

7. The 8th ground of the motion for a new trial is based upon the alleged misconduct of one of the jurors empaneled to try the case. The 9th, 10th, and 11th grounds relate to certain alleged facts tending to show that named jurors were prejudiced or biased and were not impartial; and it is unnecessary, in view of the fact that a new trial is granted upon other grounds, to pass upon these four grounds, as the questions there made will not arise upon the next trial of the case.

No. 5730. July 15, 1927.

Murder. Before Judge Park. Morgan superior court. November 1, 1926.

*J. E. Pottle, E. R. Lambert,* and *Orrin Roberts,* for plaintiff in error.

*George M. Napier, attorney-general, Joseph B. Duke, solicitor-general,* and *T. R. Gress, assistant attorney-general,* contra.

Criminal Law, 17 C. J. p. 203, n. 85, 87.

Homicide, 30 C. J. p. 142, n. 74, 83; p. 143, n. 84; p. 154, n. 63, 64; p. 170, n. 44 New; p. 184, n. 81; p. 336, n. 79; p. 346, n. 91; p. 357, n. 97; p. 396, n. 23; p. 397, n. 24; p. 410, n. 47.

Beck, P. J.    L. B. Little shot and killed J. G. Herrin on June 24, 1926. The shooting took place in the City of Madison, Morgan County, at a location specifically referred to as Thompson's garage. The grand jury of Morgan County returned an indictment charging the accused with the offense of murder; and upon the trial the jury returned a verdict of guilty, without a recommendation. The defendant made a motion for new trial, which was overruled, and he excepted.

1. Counsel for the defendant, on cross-examination, propounded to George Shaw, a witness called for the State, the following question: "Mr. Little [the defendant] has been an arresting officer here for a great many years?" To which the witness answered, "Yes." And then the following question was propounded: "Accustomed to carry a gun?" Objection was made by the solicitor-general that the witness should not be permitted to answer this question, on the ground that it sought to elicit irrelevant testimony, and the court sustained the objection. We are of the opinion that the witness should have been permitted to answer the question. Ordinarily, evidence of what the accused had done on other occasions not connected with the crime alleged against him and for which he is on trial is not admissible; but in this case evidence was introduced to show premeditation and malice on the part of the accused. There is evidence tending to show that the accused sought the deceased, came to where he was and deliberately made an attack upon him, striking him several blows with his fist, then went to his automobile, took from it his pistol and shot and killed the deceased under circumstances that made the killing murder, according to the theory of the State. The evidence of his carrying his pistol with him in his automobile would tend to establish the contention that the killing was done with malice aforethought and that the crime was a premeditated one. But if the accused was accustomed to carry his pistol, the fact that he had it with him on the occasion of the homicide would be less weighty as evidence to show that he had premeditated the alleged crime and had committed it deliberately. If the accused had been on trial for the carrying of a pistol contrary to the law, and he had denied having a pistol with him on the occasion in question, the fact that he carried it customarily, or had been seen carrying it on other occasions, could not be proved by the State, and evidence

of the fact that he had been seen with a pistol or had carried a pistol in the same way on other occasions would not be admissible. But in this case, when it is considered in connection with the State's theory of the case, it was admissible and should not have been excluded.

2. The ruling made in the second headnote requires no elaboration.

3. In another ground of the motion for a new trial error is assigned upon the court's failure to charge the law of voluntary manslaughter as contained in §§ 64 and 65 of the Penal Code, though no written request for such a charge had been made. Upon a consideration of the evidence we are of the opinion that the law of voluntary, manslaughter was involved under the evidence, and that the court should have charged the jury upon that subject. An eye-witness, W. F. Vaughan, called for the State, thus describes the encounter between the accused and the deceased and the killing of the latter: "When Mr. Little arrived he walked up to Mr. Herrin and said, 'Have you seen Dr. Tunison?' Mr. Herrin replied, 'I have not, Mr. Little,' and about that time Mr. Little said, 'You mean to continue to work my negro, do you?' and just about the time he said 'do you?' he hit him right up there side of the neck. I imagine he hit him three times before we got them separated. The first two licks he hit him when Herrin was sitting down. After he made the first two licks it seemed to me Mr. Herrin was stunned and made an effort to get up at the second lick, and about the third lick they both had locked together. I imagine he might be six feet and a half tall. The defendant weighs, in my opinion, around 180 and is about six feet tall, I imagine, and a half. He hit him with his fist, I guess. I didn't see any instrument. Mr. Emmett Alford, Herbert Perkins, and myself separated the two. After we separated them nothing was said by one to the other no more than Mr. Little—I had hold to him and he seemed to think at the time that we were holding him, and he cursed and said, 'Turn me loose,'—just that way. At the time he made that statement Mr. Herrin was, I imagine, around four feet below from where I and Mr. Little was. When Mr. Emmett Alford—after we pulled them loose, just about the time we separated them, Mr. Little said; 'God damn it, turn me loose,'—just that way. I had hold to Mr. Little. Mr. Alford had hold to

Mr. Herrin, and pulled them loose; and as we pulled them loose we had a tendency to pull apart, see. I imagine about four or five feet apart. Well, then Mr. Herrin got loose; he made for his pistol. When he made for his pistol Mr. Alford hollered at him and went to him, and also when I whirled and turned and saw Mr. Herrin with his pistol in his hand I went between him and Mr. Little and we made him put it in his scabbard and gave him a whirl and pushed him in the door, and then I turned around to see where Mr. Little was. Well, Mr. Little was coming right on, right behind me and walked to his car. Well, he walked to his car and put his foot up on the fender. I thought he was going to leave, you see. I thought he going to get in the car and leave. When he put his foot on his car he came out with his gun, and then he started to shooting, and I begged him not to shoot. I suppose he was shooting at Mr. Herrin. I didn't see Mr. Herrin from the time I whirled him and pushed him in the garage door until after he was shot. At the time we separated them and Mr. Herrin reached for his gun the defendant was not still trying to go on him; he was making off down towards him. At that time Mr. Herrin still appeared to be dazed; blood was all over his face; just looked like he couldn't hardly make it; that is, when I turned him loose and he left the sidewalk. I didn't see him from the time we pushed him in the door until after the shooting. I didn't see anybody in the garage at the time Mr. Herrin went in there, didn't even know that there was anybody back there. I did not make any examination of that room. I was standing right by Mr. Little, as close as from here to you; just stood there and asked him not to shoot. I couldn't tell what he was shooting; it was a pistol, but what make I couldn't tell you. I imagine the pistol was fired around four times. He moved while firing; it seemed to me the first two shots he was steady at it, and then, either the first, second, or last shot looked like he took aim—deliberate aim. He was firing that in the same direction Herrin had gone." On cross-examination the same witness testified, in part: "After Mr. Little drove up and stopped he got out of his car and walked over to where we were. He was unarmed. I didn't see any gun about him or any weapon of any kind. Mr. Herrin was armed. Mr. Little asked had he seen Dr. Charlie Tunison. After they went together Emmett Alford, Herbert Perkins, and myself separated

them. I had hold of Mr. Little, and they had hold of Mr. Herrin. After we separated we got Mr. Herrin in the garage down about the door. Mr. Emmett Alford and myself made him put his pistol up. He drew his gun after we pulled them loose. He didn't pull it on anybody, he reached up for his scabbard and pulled the pistol out and had it right down by his side. It was a large gun; looked like a 38; I would not swear it was. That was the first pistol I saw there on that occasion. He put it up just before we grabbed him to turn him and whirl him in the garage. I caught hold of his hand and pushed the pistol back in the scabbard and turned and gave him a whirl towards the door. Mr. Little went to his automobile."

E. L. Alford, called as a witness for the State, testified in part: "Mr. Herrin was squatting at the time he first hit him. I couldn't tell how many times he hit him while he was squatting; they clinched about that time, about the time of the first lick. Mr. Vaughan and I tried to separate them; we caught hold of them. We succeeded in separating them after Mr. Perkins came to our rescue. I didn't see any more of Mr. Little right at this time. Mr. Herrin stepped back towards the door of the garage and pulled his pistol. I don't know whether Mr. Little was moving towards him at the time he stepped back; I didn't see Mr. Little. I don't know what Mr. Little did when Mr. Herrin pulled his pistol out. After Mr. Herrin pulled his pistol out I made him put it up. He didn't do anything with it, just pulled it out; and I told him to put it back in his scabbard. After the blows had been struck Mr. Herrin seemed in a dazed condition, I don't know just exactly, he didn't look like he was at himself. He seemed to be in that dazed condition at the time he pulled the pistol. He made no effort whatever to use his pistol." And on cross-examination the same witness testified, in part, as follows: "Little did not turn immediately and go towards his automobile after we got them separated. After Mr. Herrin went into the building he did. Up to that time Little hadn't shown a gun of any kind or a weapon of any kind. He didn't have one that I know of. The first I saw of it was when he went to his automobile. . . When I told Mr. Herrin, 'We are not going to have any of this here,' I thought they were going to begin shooting, thought Mr. Herrin was. I did not grab his gun, never put my hand on it. I took hold of him and

33

told him to put his gun up. I got in between him and Little."

George Shaw, a witness for the State, testified in part as follows: "The first thing the defendant did when he reached this building was to ask Mr. Herrin if he had seen Mr. Tunison. He told him, 'You will work my negro, will you?' and hit him. I couldn't say how many times he hit him. I know he hit him twice. He hit him in the head. I think the blows were pretty heavy. Herrin had made no threatening move towards the defendant before he was hit. After he hit him they grappled and tussled, and two or three of the boys got in and separated them. After they separated them the defendant Little started back towards Mr. Herrin, and Mr. Herrin drew his gun. He made no effort to use the gun; they got him to put it back in his holster. When Herrin pulled his gun out and had it beside him, the defendant Little reached as if he was going to draw his gun; he reached toward his hip-pocket. After Herrin was told to put his gun up he put it up and started back in the garage. He did not say anything else. Little did not say anything that I heard. He walked to his car." And on cross-examination Shaw testified, in part: "Mr. Herrin pulled his gun twice, first on the outside, and they made him put it up, and after he got on the inside he pulled it again. I was looking right at him when he pulled it. He deliberately reached and got the gun and pulled it out. He put it down to his side. He made as if to raise it, but never did raise it. Little was continuing to fire at him. That is what caused him not to raise it any higher. I guess Little had the drop on him."

Herbert Perkins, called as a witness for the State, testified, in part: "When the defendant came up to where Mr. Herrin was, he asked him if he had seen Mr. Tunison, and Mr. Herrin said, no, he had not seen him. The defendant then asked him if he was going to keep working his negro. Then he hit him. Mr. Herrin made no reply to that question. He hit him with his fist beside the head twice that I know of. Mr. Herrin was squatting down in front of me at the time he hit him. After he hit him Mr. Herrin got up and they were fighting. Then we separated them. They were about five or six feet apart after we separated them. He started to move towards Mr. Herrin after they were separated. Mr. Herrin pulled his gun out when the defendant started towards him. When he pulled his pistol out he pulled it down by

his side. He made no effort to use it. We talked to Mr. Herrin, tried to get him not to use the pistol. He put it back up. He went off in the shop after that. Mr. Little went to his car."

This is only a part of the evidence of the witnesses referred to above, and it by no means presents a complete picture of what occurred; nor is it intended to bring out fully the case as shown by all of the evidence for the State; for we have quoted only that part of the testimony from which it seems that it would be a question for the jury to say whether or not there was mutual combat, and if there was mutual combat, whether the law of voluntary manslaughter as related to mutual combat was involved; and also as to whether the law of voluntary manslaughter contained in sections 64 and 65 of the Penal Code was involved.

4. Error is assigned upon the following charge of the court: "And under the laws of the State of Georgia, if the State has convinced your minds by the evidence in this case that on or about the 24th day of June in the year 1926 the defendant in this case, in the County of Morgan, with a certain pistol did inflict a wound upon the person of John G. Herrin, and if the State has further convinced your minds by the evidence in this case beyond a reasonable doubt that John G. Herrin afterwards died as a direct result of that wound, that is, that the defendant with a certain pistol killed John G. Herrin, as charged in that bill of indictment, why then, upon proof of those facts by the State, the law would presume, until the contrary is shown, that the killing was malicious, that is, with malice; and unless the evidence in behalf of the State in this case convinces your minds that it was a justifiable killing, why then, upon proof by the State that the defendant did kill John G. Herrin, if he did kill him, unless the evidence in behalf of the State shows justification, then it would devolve upon the defendant in this case to satisfy your minds that the killing was justifiable." This charge is excepted to upon the ground that the jury is there instructed that "upon proof of the killing the presumption of malice would arise, unless the evidence in behalf of the State convinced their minds that it was a justifiable killing;" while the true rule is, that upon the proof of the killing the presumption of malice arises, and the burden rests upon the defendant, unless the evidence adduced against him shows either justification or mitigation. In other words, it is not the true rule that the burden is placed upon

the defendant to negative malice except in cases where the State's evidence shows justification; for if the State's evidence shows mitigation, alleviation, or legal excuse, the burden still rests upon the State to show that the killing was with malice aforethought in order to make out the crime of murder. It appears from the report of the case of *Green* v. *State*, 124 *Ga.* 343 (52 S. E. 431), that the court upon the trial charged the jury in part as follows: "When a homicide is proven, the law presumes malice, and unless the evidence relieves the slayer, he or she should be convicted." This portion of the charge was excepted to, under the facts of the case, because the evidence introduced by the State which proved that the defendant committed the homicide also showed justification. And the court also charged: "When a homicide, however, is proven, the burden is on the slayer to justify or mitigate the offense." It was insisted in the motion for a new trial that this portion of the charge was error, upon the facts of the case, because the evidence which showed that the defendant committed the homicide also showed that she was justified in so doing; and therefore the burden was never shifted. In the opinion this court said: "Where a killing of a human being is proved, and the evidence adduced to establish the killing does not show circumstances of justification or alleviation, malice will be inferred. But if the evidence relied upon by the State to show the killing contains circumstances of alleviation or justification, the burden of proving that the crime was murder is not shifted. Until malice is shown, one vital element of the offense is lacking. This element, as we have seen, may be presumed to exist when by the evidence proving the homicide no circumstances of mitigation appear. 'The law presumes every homicide to be felonious, until the contrary appears from circumstances of alleviation, of excuse, or justification; and it is incumbent on the prisoner to make out such circumstances to the satisfaction of the jury, unless they arise out of the evidence produced against him.' *Hudgins* v. *State*, 2 *Ga.* 188." See also *Mann* v. *State*, 124 *Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934); *Surles* v. *State*, 148 *Ga.* 537 (97 S. E. 538). In the case last cited it was said: "Where the evidence relied upon by the State to establish the fact of the homicide discloses circumstances of mitigation or justification, such evidence does not raise a presumption of malice."

5. The court charged the jury, in part, as follows: "There is another principle of law that is disconnected with the principle of law that I have already given you in charge; and these principles of law that I am giving you in charge, I am quoting them from the Penal Code of the State of Georgia of 1910. The law says a bare fear on the part of the defendant that John G. Herrin was intending to commit a felony upon his person would not be sufficient to justify the killing. That is, if the circumstances that surrounded the defendant at that time were only sufficient to create in his mind a bare fear that John G. Herrin was endeavoring to commit a felony upon his person, the law says that that would not be sufficient to justify the killing, but the law does say that if the circumstances that surrounded the defendant at that time were sufficient to excite the fears of a reasonable man, that is, a reasonably self-possessed man, a reasonably courageous man, that a felony was about to be committed upon his person, and he shot under circumstances of that character and did not shoot out of envy, hatred, or malice, but shot in a bona fide effort to protect his person either from a real or apparent danger, the law says that he would be justifiable, and you would not be authorized to convict him of any offense. Now, the court charges you this principle of law in connection with the other principles of law that I have given you in charge: If a person kills another or claims to kill another in self-defense, the law says that the danger must be so urgent and pressing at that time, that is, at the time of the killing, that the danger must be so urgent and pressing at the time, or it must appear that the danger was so urgent and pressing at the time by the circumstances that surrounded the person killing that it was necessary to kill the other person to protect his person either from a real or apparent danger or an apparent felony, and unless the danger was so urgent and pressing at the time or if it did not appear that it was so urgent and pressing at the time, and if one person kills another under circumstances of that character, why then the killing would be unjustifiable and unlawful." This is excepted to upon the ground that it was error for the court to give the charge here shown, for the reason that it confused the defense provided for and set out in sections 70 and 71 and that set out in sections 72 and 73 of the Penal Code of this State. And we think that the exception is well taken. It is not necessary to

elaborate the ruling here made, and we content ourselves with calling attention to the decisions of certain cases where this court has held that a similar charge was error. In *Pryer* v. *State,* 128 *Ga.* 28 (57 S. E. 93), it was said: "While, in a proper case, on a trial of one indicted for murder, sections 70, 71, and 73 of the Penal Code may all three be given in charge, yet instructions as to the separate branches of the law of justifiable homicide should not be so given as to confuse the different defenses which may arise under those sections, and apparently to limit, by the terms of section 73, the defenses provided by sections 70 and 71." See also *Warrick* v. *State,* 125 *Ga.* 133 (53 S. E. 1027), where the same rule was laid down in substance. It is unnecessary to cite further cases upon this point, but several will be found referred to in *Warrick* v. *State,* supra.

6. The court gave the following charge to the jury in the course of his instructions, and this is excepted to: "Now, there has been something said by counsel in the argument as to the employment of a certain negro that was in the employment of the defendant in this case by Mr. John G. Herrin. I charge you that even if John G. Herrin—and I do not pretend to· say that he did or did not—but even if John G. Herrin employed a certain negro that was in the employment of the defendant in this case, that fact alone would not justify the defendant in attacking John G. Herrin, if he did attack him, and that fact alone would not justify the defendant in shooting John G. Herrin, if he did shoot him." Under the facts of the case, this charge was not error.

7. The ruling made in the seventh headnote requires no elaboration, and the facts relating to those grounds need not be more fully stated.

*Judgment reversed. Russell, C. J., ·and Atkinson, J., concur. Gilbert, J., concurs specially. Hill and Hines, JJ., dissent.*

HINES, J., dissenting. In the opinion a new trial is granted upon four grounds. The first is, that the court erred in refusing to permit a witness for the State, upon the cross-examination, upon objection of counsel for the State, to answer the question whether the accused was accustomed to carry a gun. The second is, that the court erred in failing to charge the law of voluntary manslaughter, embraced in sections 64 and 65 of the Penal Code. The third is, that the court erred in instructing the jury that if

the evidence in behalf of the State convinced them beyond a reasonable doubt that the defendant, with a pistol, killed the deceased, as charged in the indictment, the law would presume, until the contrary is shown, that the killing was malicious, and that, unless the evidence in behalf of the State showed justification, then it would devolve upon the defendant in this case to satisfy the jury that the killing was justifiable. The fourth is, that the court, in the instructions to the jury, confused the principles of self-defense set out in sections 70, 71, and 73 of the Penal Code. I deal with these questions in the order named.

1. Did the court err in the first of these rulings? It is true that when a homicide is committed with a deadly weapon, and the slayer is indicted for murder, it is competent for him to prove that he came by the weapon for an innocent purpose on the occasion. *Aaron* v. *State,* 31 *Ga.* 167. If the possession of a weapon by the slayer when the homicide is committed, and the circumstances under which the slayer came by the weapon, do not appear, he can introduce evidence to show that he had the deadly weapon for an innocent and not for an evil purpose. When, however, the circumstances attending the commission of the homicide all appear, and they show how and for what purpose the slayer procured the weapon, the mere fact that he was in the habit of carrying the deadly weapon would be irrelevant. In the instant case it appeared from the evidence that the defendant was a man over six feet tall and weighing 180 pounds; that he struck the deceased while he was squatting down, and without provocation. They then grappled. At that time the defendant was unarmed. Bystanders separated them; then the defendant went to his automobile, got his pistol, turned and immediately began to shoot at the deceased, his last shot proving fatal. Here we have undisputed proof of the manner in which the defendant obtained possession of his pistol, and the purpose for which he got it. In these circumstances it was wholly immaterial whether or not he was in the habit of carrying a deadly weapon. So I do not think that the trial judge erred in this ruling. Even if this evidence had been admissible, its probative force is so slight that a new trial should not be granted in a clear case of an unprovoked and brutal murder.

2. Did the court err in failing to give in charge the principles of law applicable to voluntary manslaughter, as set out in sec-

tions 64 and 65 of the Penal Code? In the ground of the motion for new trial in which this question is raised, the defendant does not clearly and distinctly raise the question whether the court erred in failing to charge the law of voluntary manslaughter applicable in cases of mutual combat. His exception is to the failure of the court to charge the principles embodied in sections 64 and 65 of the Penal Code. It is true that in this ground, after making this specific exception, the movant says that the doctrine of voluntary manslaughter was involved in the trial of the case, from the testimony of the sworn witnesses, from which the jury would have been authorized to find that the encounter between the defendant and the deceased, resulting in the death of the latter, was the result of a sudden heat of passion on the part of both, and that there was a mutual intention to fight with deadly weapons. While I do not think that there is any clear and specific assignment of error growing out of the failure of the court to charge the law of voluntary manslaughter, applicable to a homicide growing out of mutual combat, I shall deal with this ground of the motion as if proper assignments of error were made upon both aspects of this question.

In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. Under the evidence there was no actual assault by the deceased upon the defendant. It is true that evidence of such an assault may be found in a mutual intent to fight, and in the fact of an approach by the decedent to the defendant in furtherance of this design, where it was not necessary for him to do so in self-defense. *Ray* v. *State,* 15 *Ga.* 223; *Buchanan* v. *State,* 153 *Ga.* 866, 870 (113 S. E. 87). There was no attempt by the deceased to commit a serious personal injury on the defendant. There were no other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either express or implied. The defendant unjustifiably attacked the deceased, by striking him with his fist. When struck, the deceased was squatting down, and the defendant was standing up over him. The deceased, as we have seen, was a man over six feet tall and

weighing 180 pounds. He struck the deceased with such force that the latter was dazed. The defendant struck the deceased three times. After the first blow was struck, they grappled and tussled. There is no evidence that the deceased in this tussle struck the defendant, or attempted to commit any serious personal injury on the slayer. What the deceased did was purely in self-defense, against an unprovoked and outrageous assault. There were no other equivalent circumstances to justify the excitement of passion on the part of the slayer, and to exclude all idea of deliberation or malice, either express or implied. Consequently there was no evidence requiring a charge upon the law of voluntary manslaughter, and the failure of the court to charge upon that subject was not error. *Felder* v. *State,* 149 *Ga.* 538 (101 S. E. 179); *Evans* v. *State,* 151 *Ga.* 434 (107 S. E. 38).

Was there any evidence of a mutual intention to fight? After the defendant struck the deceased, and they grappled, they were separated by bystanders. After this separation the deceased drew his pistol. He held it by his side. He did not point it at the defendant. He made no effort to use it in any way. Evidently he drew it for the purpose of defending himself against any further attack from the defendant. He said nothing that indicated that he intended to use it, or intended to fight. The bystanders told him to put up his pistol, which he did. There is some difference in the testimony for the State as to the manner in which he put the pistol up. Some of the witnesses testified that when told to put it up the deceased himself put the pistol in its holster. One of the witnesses for the State testified that he pushed the pistol into the holster. The bystanders shoved the deceased into the hallway of the garage. The defendant demanded that the bystanders who held him, after the parties were separated, should turn him loose. He pulled loose, went immediately to his automobile, without looking back to see what the deceased was doing, got his pistol, whirled around and immediately began to shoot at the deceased. He shot a number of times. The deceased was retreating down the hallway of the garage when the defendant began to shoot. It is true that the deceased, after the defendant began to shoot at him, drew his pistol. It is inferable that it was his intention to use it in his defense against the murderous assault of the defendant, but for some reason he did not. The deceased did not

fire a shot. The defendant shot a number of times. All of the shots of the defendant, except his last, failed to take effect. Before firing the last shot he took more deliberate aim. This shot struck the deceased, inflicting a mortal wound, of which he died. Nothing that the deceased said or did indicates, or tends to indicate, that it was his intention to engage in mutual combat with the defendant. All he did was done defensively against the deliberate and unjustified acts of the defendant. When a person is unjustifiably attacked and he defends himself, he can not be said to be engaged in mutual combat. The exercise of the right of self-defense does not make a party a mutual combatant. Otherwise the principle embraced in section 73 of the Penal Code would be applicable in every case when a person unjustifiably and feloniously attacked undertook to defend himself. *Ray* v. *State,* 15 *Ga.* 223 (5); *Buchanan* v. *State,* supra. Where the accused was the aggressor, he can not justify the killing by showing that the deceased was in the act of drawing his pistol to protect himself. *Bowden* v. *State,* 126 *Ga.* 578 (3) (55 S. E. 499). In his statement the defendant gave this account of the fatal rencounter: "I saw Johnny G. [the deceased] there in front of the garage. I drove up right to the edge of the curbing, my car stopped in two feet of the curb, right in front of the door, the main entrance, got out of my car and walked up to where they were at. As I was walking up I said, 'Johnny G., have you seen Mr. Tunison?' He said, 'No,' and I said, 'Well, you just going to keep hiring my hand anyway, are you?' and he made a pass like he was going to get a pistol, and I hit him, and we clinched, and I hit him several licks in the face while we were clinched, and they separated us and they pulled me back up the street. He run backwards and jerked his gun out and throwed it on me. The others turned me loose. He throwed it on me and Wink Vaughan jumped between us and grabbed him and said, 'Don't do that; let's don't have none of that here,' and I just stood there. I didn't have anything in the world in my hand, no pistol about me, and he pushed him on around the corner of the door, back in the garage, and I was still standing about ten feet above the door. My car was standing out in front, and he pushed him around the corner, and I thought he was gone. I went on out to my car to get into my car to go home. I was through with it. I didn't want to hurt the boy or nothing, and I

had done had all the trouble with him I wanted to have, and I went to get in my car. I looked around to see what had become of him with that pistol, and I saw him. He was trying to get the pistol out, he was pulling it, and I just reached in the car and grabbed my gun and wheeled and began shooting just as rapid as I could right at him, and he was dodging and wheeling, looked like he was trying to look around the smoke of my pistol when I was shooting, and I thought I was in danger of my life; hadn't I would not have shot; if he had not had his pistol, getting his pistol out, I would have never have touched mine. I had no idea of getting my pistol at all when I went to the car, and when I got out of my car I had no more idea of having trouble with him than I have with you all now. I simply got out to have a conversation with him and Mr. Thompson, thought we would get all together there and have a conversation, and I shot to save my own life. I thought he was fixing to shoot me and he was trying to shoot; looked like he was shooting all the time to me, had his pistol pointed right towards me, right down the edge of the wall, had his side to me kind of this way [indicating], dodging that way and dodging down as I was shooting, looked like he was trying to look under my smoke to get a shot at me, and why he didn't shoot I don't know. I thought he was shooting all the time. They say there was no empty shells in his pistol, but I thought he was shooting at me all the time. I was looking every minute to get hit with a bullet. . . . What I done I done to save my own life."

The defendant does not say in his statement that he shot under the excitement of passion. The evidence for the State makes a clear case of wilful and unprovoked murder. The statement of the accused tends to show that he acted in self-defense. In these circumstances the court did not err in failing to charge upon the subject of voluntary manslaughter, as embraced in sections 64 and 65 of the Penal Code. *Wilder* v. *State,* 148 *Ga.* 270 (96 S. E. 325); *Lamar* v. *State,* 153 *Ga.* 216 (2) (111 S. E. 914). Nor was the law of voluntary manslaughter, as relating to mutual combat, involved under the evidence, as there was nothing in the evidence tending to show any mutual combat on the part of the deceased, all of his acts in the rencounter resulting in his death being purely defensive. If voluntary manslaughter was involved under the statement of the accused, it is admitted that his counsel made no request

for a charge upon the subject, and in the absence of such request the failure of the court to charge upon such subject, when the theory of voluntary manslaughter arises solely from the statement of the defendant, does not require the grant of a new trial. *Felder* v. *State,* supra. So the judgment should not be reversed for the court's failure to charge upon the law of voluntary manslaughter.

3. The defendant complains of the court's instruction to the jury set out in the fifth special ground of his motion for new trial. The court, in substance, instructed the jury that if the evidence for the State convinced them that on or about June 24, 1926, the defendant, in the County of Morgan, with a pistol, killed the deceased, as set out in the indictment, then upon such proof the law presumes, until the contrary is shown, that the killing was malicious, and that unless the evidence in behalf of the State convinced them that it was justifiable homicide, it would devolve upon the defendant in the case to satisfy them that the killing was justifiable. The defendant excepts to this charge upon the ground that the true law is, that upon proof of the killing the presumption of malice arises, and the burden rests upon the defendant to show justification or mitigation, unless the State's evidence shows one or the other. In other words, the defendant contends that it is not the true law that the burden is placed upon him unless the State's evidence shows full justification, but that such burden would only rest upon him if the State's evidence failed to show justification or mitigation. On the other hand, if either justification or mitigation appeared from the evidence introduced by the State, the burden would not be shifted, and it would not rest upon the defendant to rebut the presumption of malice.

The law presumes every homicide to be felonious, until the contrary appears from circumstances of alleviation, or of excuse, or of justification; and it is incumbent on a defendant charged with murder to make out such circumstances to the satisfaction of the jury, unless they arise out of the evidence produced against him. *Hudgins* v. *State,* 2 *Ga.* 173, 188. Where the evidence relied upon by the State to establish the fact of homicide discloses circumstances of mitigation or justification, such evidence does not raise a presumption of malice. If either mitigation or justification appears from the evidence produced by the State, there is no presumption of malice. *Dowdy* v. *State,* 96 *Ga.* 653 (23 S. E. 827) ; *Green*

v. *State,* 124 *Ga.* 343 (supra); *Mann* v. *State,* 124 *Ga.* 760 (supra); *Elliott* v. *State,* 132 *Ga.* 758 (64 S. E. 1090); *Surles* v. *State,* 148 *Ga.* 537 (97 S. E. 538); *Burley* v. *State,* 158 *Ga.* 849 (2) (124 S. E. 532). So if justification did not appear from the evidence introduced by the State, but mitigation or alleviation did appear therefrom, this charge would have been erroneous and would require the grant of a new trial. But neither justification, mitigation, nor alleviation appeared from the evidence produced against the defendant by the State; and for this reason this instruction does not require the grant of a new trial. This instruction further placed upon the defendant the burden of showing that the homicide was justifiable. In some circumstances this charge would have put upon the defendant a greater burden than the law imposes. If by his evidence or by his statement the defendant made a case tending to show circumstances of alleviation or mitigation, although he did not show justification, he would have carried the burden which the law placed upon him, and this charge, placing upon him a greater burden than the law imposed, would require the grant of a new trial. But the defendant relies solely upon self-defense in this case. In his statement he sets up full justification. He states no facts which would make the homicide more than justifiable homicide. He states that what he did was to save his own life against a felonious assault upon him by the deceased. In these circumstances the burden was upon him to show justification, neither justification nor mitigation appearing from the evidence of the State, and mitigation or alleviation not appearing from his evidence or his statement. So this instruction of the court was not erroneous because too narrow, or because it placed upon the defendant a burden greater than that imposed by law, under the facts of this case. It was adjusted to the facts appearing in the record.

In the sixth ground the plaintiff in error complains of the following charge to the jury: "There is another principle of law that is disconnected with the principle of law that I have already given you in charge; and these principles of law that I am giving you in charge, I am quoting them from the Penal Code of the State of Georgia of 1910. The law says a bare fear on the part of the defendant that John G. Herrin was intending to commit a felony upon his person would not be sufficient to justify the kill-

ing. That is, if the circumstances that surrounded the defendant at that time were only sufficient to create in his mind a bare fear that John G. Herrin was endeavoring to commit a felony upon his person, the law says that that would not be sufficient to justify the killing; but the law does say that if the circumstances that surrounded the defendant at that time were sufficient to excite the fears of a reasonable man, that is, a reasonably self-possessed man, a reasonably courageous man, that a felony was about to be committed upon his person, and he shot under circumstances of that character, and did not shoot out of envy, hatred, or malice, but shot in a bona fide effort to protect his person either from a real or apparent danger, the law says that he would be justifiable, and you would not be authorized to convict him of any offense. Now, the court charges you this principle of law in connection with the other principles of law that I have given you in charge: If a person kills another or claims to kill another in self-defense, the law says that the danger must be so urgent and pressing at that time, that is, at the time of the killing, that the danger must be so urgent and pressing at the time, or it must appear that the danger was so urgent and pressing at the time, by the circumstances that surrounded the person killing, that it was necessary to kill the other person to protect his person either from a real or apparent danger or an apparent felony, and unless the danger was so urgent and pressing at the time, or if it did not appear that it was so urgent and pressing at the time, and if one person kills another under circumstances of that character, why then the killing would be unjustifiable and unlawful." The defendant excepts to this charge upon the ground that it confuses the defenses set out in sections 70, 71, 72, and 73 of the Penal Code. The defendant contends that one is justifiable in killing if the slayer, as a reasonable man, had sufficient ground to believe that his life was in danger, or that a felony was about to be committed upon his person, and that whether in point of fact he was in danger of a felony being committed upon his person, or that his life was in danger, is wholly immaterial, provided the circumstances were of such a character as to justify a reasonably prudent and courageous man in honestly believing that there was such danger. He asserts that it need not appear that the killing was absolutely necessary, as provided in section 72 of the Penal Code. He says that the

court erred in submitting both of these principles in immediate connection with each other, and that by so doing he necessarily confused the two separate defenses.

The court charged the law of self-defense, as laid down in section 70 of the Penal Code. He then defined the meaning of the term "felony," as used in that section of the Code. Then followed the instruction complained of in the sixth ground of the motion for new trial. He did not charge the jury the law of self-defense as set out in section 73 of the Penal Code. It is now well settled that in a proper case, on the trial of one for murder, sections 70, 71, and 73 of the Penal Code may all three be given in charge, but instructions on the separate branches of the law of justifiable homicide should not be so given as to confuse the different defenses which may arise under these sections, and apparently limit, by the terms of section 73, the defenses provided by sections 70 and 71 of the Penal Code. *Warrick* v. *State,* 125 *Ga.* 133 (7) (supra) ; *Pryer* v. *State,* 128 *Ga.* 28 (supra) ; *Franklin* v. *State,* 146 *Ga.* 40 (90 S. E. 480) ; *White* v. *State,* 147 *Ga.* 377 (3) (94 S. E. 222) ; *Surles* v. *State,* 148 *Ga.* 537 (7) (supra) ; *Shepherd* v. *State,* 150 *Ga.* 799 (105 S. E. 485). To charge sections 70, 71, and 73 consecutively, and without instructions to the jury as to the applicability of the different aspects of the case, tends to confuse the defenses provided under these sections, and such confusion requires the grant of a new trial. But in the instant case the court did not charge section 73 of the Penal Code. He did not charge sections 70, 71, and 73 consecutively. He charged section 71. After charging the principle of law laid down in section 70, he told the jury that "There is another principle of law that is disconnected with the principles of law that I have already given you in charge," referring to the principles laid down in section 70. He then charged the principle of self-defense laid down in section 71. Then in connection with the principles of law of self-defense, embraced in sections 70 and 71 of the Penal Code, he charged the jury as follows: "If a person kills another or claims to kill another in self-defense, the law says that the danger must be so urgent and pressing at that time, . . or it must appear that the danger was so urgent and pressing at the time by the circumstances that surrounded the person killing that it was necessary to kill the other person to protect his person either from a real or apparent danger

or an apparent felony, and unless the danger was so urgent and pressing at the time, or if it did not appear that it was so urgent and pressing at the time, and if one person kills another under circumstances of that character, why then the killing would be unjustifiable and unlawful." It will be noted that the court was charging the jury upon the subject of reasonable fears as a defense for the taking of human life. In cases where reasonable fear is the ground upon which self-defense is based, must the danger be urgent and pressing, or apparently so, in order to justify the killing? In *Jackson* v. *State,* 91 *Ga.* 271 (18 S. E. 298, 44 Am. St. R. 22), this court, speaking through Chief Justice Bleckley, said: "The doctrine of reasonable fear as a defense does not apply to any case of homicide where the danger apprehended is not urgent and pressing, or apparently so, at the time of the killing." In *Williams* v. *State,* 120 *Ga.* 870, 873 (48 S. E. 368), this court, speaking through Mr. Justice Evans, said: "The court, while charging as to what the law regards as the fears of a reasonably courageous man, told the jury that the danger 'apprehended must be urgent and pressing, or apparently so, at the time of the killing.' It is insisted by the plaintiff in error that this instruction was not applicable to this case, and could only apply to a case where the evidence disclosed 'a mutual intention to fight.' We can not concur in this view. 'A bare fear' of injury can never be regarded as sufficient to justify a homicide. Penal Code, § 71. And, as was said in the case of *Jackson* v. *State,* 91 *Ga.* 271 (1): 'The doctrine of reasonable fear as a defense does not apply to any case of homicide where the danger apprehended is not urgent and pressing, or apparently so, at the time of the killing.'" In *Short* v. *State,* 140 *Ga.* 780 (80 S. E. 8), this court, speaking through Mr. Justice Evans, said: "'The doctrine of reasonable fear does not apply to any case of homicide where the danger apprehended is not urgent and pressing, or apparently so, at the time of the killing.'" So I do not think that the court erred in this instruction to the jury, upon the facts and circumstances of this case. Finally, if there was any error in this instruction, under the facts of this case a new trial should not be granted.

Mr. Justice Hill authorizes me to say that he concurs in this dissent.