306 Ga. 867
FINAL COPY

S19A0530.  RODRIGUES v. THE STATE.

BETHEL, Justice.

In February 2014, a jury found Leonard Rodrigues guilty of malice murder and other crimes in connection with the stabbing death of Nathaniel Reynolds.[1] Rodrigues appeals, contending that the trial court erred by allowing improper testimony regarding the circumstances of prior bad acts to be admitted at trial. For the reasons stated below, we affirm.

1. Viewed in the light most favorable to the jury's verdict, the

---

[1] The crimes occurred on January 8, 2013. On July 8, 2013, Rodrigues and his co-defendant, Ricardo Beltran Gonzalez, were indicted by a Chattooga County grand jury for: (1) malice murder; (2) felony murder predicated on aggravated assault; and (3) aggravated assault. At a joint jury trial of Rodrigues and Gonzalez in February 2014, the jury found Rodrigues and Gonzalez guilty on all charges. Rodrigues was sentenced to a term of life imprisonment for malice murder (Count 1). The trial court purported to merge Counts 2 and 3 with Count 1, but the felony murder count was actually vacated by operation of law.  See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993).

Rodrigues filed a motion for new trial on February 27, 2014, and amended it through new counsel on September 10, 2018. After a hearing, the trial court denied the motion for new trial as amended on September 28, 2018. Rodrigues then filed a timely notice of appeal, and the case was docketed in this Court for the April 2019 term and submitted for a decision on the briefs.

evidence presented at trial showed that, on January 18, 2013, correctional officers at Hays State Prison in Chattooga County were transporting Nathaniel Reynolds and several other inmates from the prison's Special Management Unit (SMU) back to the general population. Reynolds had been in the SMU as the result of a previous altercation with Rodrigues. Reynolds' request to be removed from the SMU had been granted, so he and one other inmate were being returned to their dormitories.

At the same time that Reynolds and the other inmates were being moved out of the SMU, other inmates housed in one side of C dormitory were returning from the dining hall. A Correctional Emergency Response Team (CERT) officer was posted in the middle of the compound, pursuant to the practice of having CERT officers present any time there is mass movement of inmates. The CERT officer opened the gate so that the officers and the inmates they were transporting could continue to the dormitory.

While Reynolds was getting his property off a cart, Rodrigues and Gonzalez came out of the dormitory and ran at Reynolds with

weapons. Reynolds started backing up, but Rodrigues and Gonzalez cornered Reynolds into a gate and began to stab him with shanks. Rodrigues had two shanks and Gonzalez had one. Because the gates were secured on both sides of the dormitory, there was no way for Reynolds to retreat. Reynolds, who did not have a weapon, got into a "fighting stance" and tried to defend himself.[2] The CERT officer sprinted toward the scene and tried to break up the altercation. The officer yelled at Rodrigues and Gonzalez to stop and lie down on the ground, but they continued to stab Reynolds with shanks, ultimately stabbing him 17 times. The officer then pulled out his pepper spray and dispersed it, at which time Rodrigues and Gonzalez put down their shanks and lay face down on the pavement.

One of the correctional officers instructed Reynolds to lie down on the ground and started escorting the inmates who had been in

---

[2] Five correctional officers testified that they saw Rodrigues and Gonzalez stab Reynolds. On cross-examination, defense counsel asked one of the officers who witnessed the altercation about his prior inconsistent statement to the GBI agent who investigated the incident, that "Reynolds advanced on [Rodrigues and Gonzalez]." In response, the officer testified that "[w]hen [Reynolds] first saw [Rodrigues and Gonzalez] he took one step and then he stepped straight backwards."

3

the area to the SMU as a precautionary measure. A third correctional officer told Reynolds to put his hands behind his back to be handcuffed, and Reynolds complied. However, as soon as the officer pulled his handcuffs out, Reynolds collapsed. A few minutes later, Reynolds died.

Rodrigues testified at trial in his own defense that, on a Sunday in September 2012, Reynolds took down one of the three televisions in the dormitory and broke it. Reynolds then changed the channel on one of the other two televisions, on which Rodrigues was watching a program. When Rodrigues asked Reynolds why he changed the channel, Reynolds said that if Rodrigues did not let him watch that television, he would break it. Rodrigues testified that he started to leave the room, at which point Reynolds stabbed him. Rodrigues went to his cell and did not report the incident, but someone in the security office found out about it, and both he and Reynolds were sent to the SMU following this incident. Rodrigues remained in the SMU for six days. Rodrigues testified that, during the five-and-a-half months that Reynolds was in the SMU, he sent

4

threats to Rodrigues that when he got out of the SMU, he was going to "finish [Rodrigues] off."

Rodrigues testified that, on the date Reynolds was killed, he did not know that Reynolds was going to be released from the SMU. Rodrigues testified that all the inmates at Hays carried shanks, and that he always carried two for "security." Rodrigues testified that, while he was walking from the dining hall back to the dormitory, Reynolds saw Rodrigues and immediately started coming toward him. Rodrigues testified that Reynolds put his hand in his pants and Rodrigues thought Reynolds might have a weapon. He testified that he then "went towards" Reynolds to keep Reynolds from having a chance to attack him. Rodrigues did not deny attacking and stabbing Reynolds, and he testified that he did not know if Reynolds had a weapon.

A second CERT officer at Hays came into contact with Rodrigues several times after Reynolds was killed. The CERT officer testified that Rodrigues told him that he stabbed Reynolds and that he did not care if Reynolds died. The cause of Reynolds' death was

sharp force trauma to the chest.

Although Rodrigues has not challenged the sufficiency of the evidence, it is our customary practice to review the sufficiency of the evidence in murder cases, and we have done so here. After reviewing the record of Rodrigues' trial, we conclude that the evidence presented against him was more than sufficient to authorize a rational jury to find beyond a reasonable doubt that Rodrigues was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Rodrigues contends that the trial court erred in admitting the testimony of GBI Special Agent Dale Wiley regarding the circumstances of a 2008 stabbing incident involving Rodrigues. Pretermitting whether it was error for the trial court to admit this evidence at trial, any error in this regard would not require the

reversal of Rodrigues' conviction because it was harmless. See *Kirby v. State*, 304 Ga. 472, 487 (4) (c) (819 SE2d 468) (2018). Here, the State filed a notice of its intent to introduce evidence of the circumstances of the prior stabbing incident pursuant to OCGA § 24-4-404 (b), which states in pertinent part:

> Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident….

The trial court admitted the evidence as relevant to an issue other than Rodrigues' character — intent — and found that the probative value of the evidence was not substantially outweighed by any danger of unfair prejudice. The trial court provided a limiting instruction immediately before the witness testified about the prior crimes and again during the final charge to the jury, both of which instructed the jury that it could consider the evidence only as to the issue of intent.

The evidence consisted of the testimony of Special Agent Wiley,

who participated in the investigation of the 2008 death of Enrique Lopez Ramirez. Ramirez was stabbed in the right-hand side of his upper torso. Agent Wiley testified that as part of his investigation, he spoke with Rodrigues after giving Rodrigues the *Miranda* warnings.[3] Rodrigues initially claimed that the victim's dog attacked him, which provoked a scuffle between Rodrigues and the victim, each of whom had a knife, but Rodrigues' appearance did not indicate he had been injured by a dog. Agent Wiley also testified that Rodrigues later changed his story, claiming that there was only one knife involved.  Following the 2008 incident, Rodrigues was charged with malice murder of Ramirez, felony murder, aggravated assault, and possession of a firearm or knife during the commission of certain crimes. Rodrigues pleaded guilty to involuntary manslaughter as a lesser included offense of felony murder on February 2, 2009, and was sentenced to serve ten years in prison. In addition to Agent Wiley's testimony, evidence of Rodrigues' plea and sentence was

---

[3] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1969). Rodrigues was not incarcerated when he was interviewed by Agent Wiley with regard to this incident.

introduced at the 2014 trial.

Even assuming an error in the admission of this prior acts evidence, any such error was harmless "given the substantial evidence of [Rodrigues'] guilt" in this case. *Parks v. State*, 300 Ga. 303, 308 (2) (794 SE2d 623) (2016). "[T]he test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.) *Jackson v. State*, 306 Ga. 69, 80 (2) (c) (829 SE2d 142) (2019). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." (Citation and punctuation omitted.) Id.

Rodrigues' sole defense at trial was that he acted in self-defense when he stabbed Reynolds. Under OCGA § 16-3-21 (a), "[a] person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force[.]"

However, as this Court has long held, "[t]he doctrine of reasonable fear does not apply to any case of homicide where the danger apprehended is not urgent and pressing, or apparently so, at the time of the killing." *Carter v. State*, 285 Ga. 565, 566 (678 SE2d 909) (2009) (quoting *Short v. State*, 140 Ga. 780 (3) (80 SE 8) (1913)). Here, there was only slight evidence that Rodrigues believed he was in imminent danger at the time of Reynolds' stabbing. The fact that Rodrigues had previously been stabbed by Reynolds does not change this result. See id. at 566-567.

Instead, "the overwhelming evidence against [Rodrigues], completely independent of the [other-acts] evidence offered by [the State], pointed directly to an intentional and malicious killing committed by [Rodrigues] in this case rather than one that was committed in self-defense." *Walker v. State*, 306 Ga. 44, 49 (3) (829 SE2d 121) (2019). See also *Parks*, 300 Ga. at 308 (2). It is undisputed that Rodrigues stabbed Reynolds. Rodrigues did not deny initiating the attack against Reynolds, and he admitted at trial that he did not know if Reynolds was armed when he decided to attack him.

10

Rodrigues further testified that he stabbed Reynolds with two shanks for an extended period until the guards were able to subdue him with pepper spray. In addition, the testimony of five correctional officers indicated that Rodrigues and Gonzalez were the aggressors, and that the pair cornered an unarmed Reynolds before stabbing him a total of 17 times. Therefore, Rodrigues' "claim of self-defense falls flat." *Parks*, 300 Ga. at 308 (2). Moreover, the marginal harm of learning that Rodrigues was previously convicted of involuntary manslaughter related to a stabbing is unlikely to have substantially impacted the jury's perception of Rodrigues, given that they were already aware that Rodrigues was incarcerated at the time of Reynolds' killing. As a result, even assuming the admission of testimony regarding the circumstances of the 2008 stabbing incident involving Rodrigues was erroneous, we conclude that it is highly probable that the evidence did not contribute to the jury's verdict. Accordingly, there is no reversible error.

*Judgment affirmed. All the Justices concur.*

11

DECIDED OCTOBER 7, 2019.

Murder. Chattooga Superior Court. Before Judge Graham.

*Victor P. Aloisio III, David J. Dunn, Jr.*, for appellant.

*Herbert E. Franklin, Jr., District Attorney, Kevin J. Baugh, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.