75920. DURDEN v. THE STATE.
(369 SE2d 764)

BIRDSONG, Chief Judge.

This is an appeal of a conviction for two counts of driving under the influence in violation of OCGA § 40-6-391. The main ground of appeal involves expert testimony as to appellant's blood and urine samples and the evidence of marijuana usage shown thereby. *Held*:

1. The trial court erred in admitting evidence of, and allowing the forensic expert to testify to, the presence of 180 to 200 nanograms of THC metabolites per milliliter of blood and urine sampled, and as to the degree, quantity, and effect of marijuana usage indicated or proved by these particular test results.

The appellant under OCGA § 17-7-211 duly requested copies of all written scientific reports which would be introduced into evidence. The State submitted to him a copy of a crime lab report which states, in pertinent part, simply: "Results: Immunoassay techniques indicate the presence of tetra-hydrocannabinol (marijuana) and/or metabolites in the blood specimen. Immunoassay techniques indicate the presence of tetra-hydrocannabinol (marijuana) and/or metabolites in the urine specimen."

At trial, the forensic witness over objection was permitted to testify at length as to her test results not stated in the crime lab report, which were that appellant's blood and urine samples contained approximately 180-200 nanograms of THC per milliliter. The prosecutor's direct questions were put this way: "Q. What were the results of your tests? A. I found marijuana metabolites in the blood sample and the urine sample. Q. As part of the way you test samples and the way

that you indicate results, do you have a scale by which you quantify the amount of marijuana metabolites found in the system? A. Yes, sir. We can give a rough estimate. In order for us to issue a statement on the report that marijuana metabolites were found, there has to be at least 25 nanograms per milliliter present. We run a set of standards along with the blood samples. We run a blank. One spiked at 10 nanograms per mil, 25, 50, 100 and 250. Referring back to my notes on this case, this particular sample had between 100 and 250, approximately 200 mils. Q. Are you able to quantify that specifically? A. You know, my best guess would be approximately 200. 180 to 200 milligrams per mil. Q. Is that a significant amount? A. Yes, sir."

The defense objected strenuously and stated it had no objection if the State were only to admit that THC metabolites were found, as stated in the crime lab report, but that the State should not be allowed to quantify that stated result by giving the expert testimony just described. The trial court allowed the evidence, because the expert testified that these test results were written only in her "working notes" and thus were never written in a report which would have been required to be submitted to the defendant.

Her direct examination continued: "Q. Ms. Callahan, I believe we were at the point where you were going to tell me the results of the tests that you performed on the blood and urine samples. A. Yes, sir. Marijuana metabolites were found in the blood specimen and the urine specimen. Q. Did you take steps to insure these results were accurate? A. Yes, sir. Q. What steps did you take? A. Any time we do marijuana testing we run a set of standards along with it. We run a blank blood, one that is spiked with 25 nanograms per milliliter, one that is spiked at 10 nanograms per milliliter, 50 nanograms per milliliter, 100 nanograms and 250 nanograms per milliliter. In order for us to issue a statement on a report, we feel there needs to be at least 25 nanograms per milliliter there . Q. You said that your . . . quantitative scale is from 25 nanograms per milliliter to 250 nanograms? A. Actually, zero to 250. Q. Was the sample, the blood sample of Mr. Durden's quantified on this scale? A. Yes, sir. I went back and looked in my notes and there was approximately 180 to 200 nanograms per milliliter present.

"Q. Is that amount significant? A. Yes, sir. That indicates to us that there has been recent usage of marijuana, or that a person is a daily chronic abuser of marijuana. Q. You said it indicates recent usage. What type of time span are we looking at? A. Probably within the past three to five hours prior to obtaining the blood sample.

"Q. You have studied the effects that marijuana has on average individuals? A. Yes, sir. Q. What type of effect would this metabolite level, 180 to 200, have on the average person? A. Somebody who is under the influence of marijuana has very intense concentration. By

that I mean they may be focusing specifically on one aspect of their driving and neglect everything else. They may be looking for a particular road sign and not notice anything else. They may be listening to the radio and not be aware of anything else that is going on around them. Their tracking ability is diminished. By that I mean they can't hold their car within the two lanes of the road very well. They do have muscular weakness. . . . Q. Based on your opinion as an . . . expert witness in this case, would you have an opinion as to whether there were physical manifestations? A. Yes, sir. . . . They would probably be very unsteady on their feet, their mind would tend to not be able to focus too clearly. Probably glassy-eyed. Q. Ms. Callahan, based on your experience and based on your training and any studies you may have had in the area of pharmacology and toxicology, would you have an opinion as to whether someone with this level of tetrahydrocannabinol, marijuana, whether that person would be under the influence of marijuana? A. Yes, sir. . . . At that level of marijuana, in addition to the alcohol, with the two combined together would be much detrimental to someone's driving ability.

"Q. Mr. Panter testified that the alcohol level was a .04, and you testified that the THC level was from 180 to 200. A. Approximately. Q. In your opinion and based on your experience and your training, would a person having that combination be under the influence to the extent that they were a less safe driver? A. Yes, sir. . . .

"Q. If a person is a chronic user of marijuana, would it be your opinion that they would have scored or scaled this high, on your scale from 180 to 200? A. . . . It depends on how frequently they are using it. If they were just smoking one marijuana cigarette a day, I would not found [sic] it this high. Q. Even if a person is a chronic user, from your experience is there anything that this high level would indicate to you about recent usage, or could anything — A. He could be a chronic user and just recently have smoked it also. That could be a possibility, if that is what you are asking. Q. Is there anything that Mr. Akins has asked you that has changed your opinion whatsoever as to, given the manifestations that I mentioned before, and the blood alcohol level and the level of THC, is there anything that has changed your opinion as to whether Mr. Durden was under the influence to the extent he was a less safe driver? A. No, sir."

We have cases holding that "OCGA § 17-7-211 requires the defendant be given a complete written copy of the results of any scientific test, but . . . the statute does not require the State to furnish the written work materials upon which the results and conclusions in the scientific report were based." *Johnson v. State*, 174 Ga. App. 579 (330 SE2d 791), and cases cited. "Lab notes and recordation of data which the State Crime Lab used to determine the makeup of certain controlled substances" are included in the matter not required to be pro-

duced. *Hartley v. State*, 159 Ga. App. 157 (2) (282 SE2d 684). A checklist or the expert's "working notes" (*Johnson*, supra), or an internal document (*Walker v. State*, 168 Ga. App. 130, 132 (308 SE2d 404)) is not required to be produced. That is what the State contends these test results are in this case.

The witness' characterization of these test results as merely part of her "working notes," and her explanation that it is not customary for the crime lab to include these test results in what it (and the State) calls its "written scientific reports" subject to production, are not impressive. If it were acceptable to the statutory scheme for the forensic witnesses simply to omit the *actual test results* from the scientific results they choose to write, and thus produce, and to put the test results in their private notes and then testify to them, then the statute has no meaning at all.

What constitutes a "written scientific report" under § 17-7-211 is not governed by what the forensic lab and the State choose to put in writing and produce. While we and the Supreme Court have held that the notes and work products of a State's expert do not fall within the purview of OCGA § 17-7-211 (*Williams v. State*, 251 Ga. 749, 753 (312 SE2d 40), and cases cited), it is very clear the matter at issue here was not just "notes and work products," but was the actual test results upon which the witness with particularity based her entire conclusion and testimony as to appellant's consumption of marijuana and its effect. These test results were the analysis of appellant's bodily fluids and had scientific significance of themselves, unlike the graphs in *Williams*, which had no significance until interpreted in comparison.

The statute provides the defendant on request is entitled to a copy of "any written scientific reports . . . which will be introduced in whole or in part against the defendant by the prosecution in its case-in-chief or in rebuttal." OCGA § 17-7-211 (b). The statutory objective is not to produce whatever test results the lab chooses to make "written," but to give defendant access to *"scientific reports . . . which will be introduced in whole or in part against the defendant."* (Emphasis supplied.) "The clear language of the statute provides that *any* evidence of a scientific test offered by the state in its case-in-chief or in rebuttal is subject to discovery with the accompanying sanction of non-use for failure timely to release the evidence known to the state." *Mulkey v. State*, 167 Ga. App. 627, 630 (307 SE2d 117).

In *Williams*, supra, p. 754, the common element of a "scientific report" was said to be that each includes the examiner's *"findings based on scientific analysis* or his or her *opinion."* (Emphasis supplied.) The evidence here is the actual empirical test results, the expert's "findings based on scientific analysis." Allowing her to testify on the basis of the test results allowed the State to "do indirectly that

which is prohibited directly," that is, to refuse to produce to defendant the scientific evidence upon which it relied in its case against him. See *Tanner v. State*, 160 Ga. App. 266, 268 (287 SE2d 268).

In *McDaniel v. State*, 169 Ga. App. 254, 255 (312 SE2d 363), we said: " 'Although it might be argued that to permit the introduction of this evidence in this case will be precedent for the state deliberately to instruct witnesses not to prepare reports otherwise discoverable pursuant to OCGA § 17-7-211 (c) . . . there is no evidence suggesting bad faith on the part of the prosecution in this case. . . .' *Olson v. State*, 166 Ga. App. 104 (4) (303 SE2d 309). . . ." However, in a case like this, when the State or its witness chooses to leave out of its "written report" the quantifying substance of its forensic case against the defendant, the prejudice to the defendant in being denied his discovery rights under § 17-7-211 is the same whether done in bad faith or not. The expert's testimony is quoted extensively here to show this prejudice, in that the scientific evidence which was denied to the defense, in fact comprised the entire substance of the State's case.

The judgment below is reversed on this basis. The failure to produce this evidence in the "written scientific report" left the defense counsel at a huge disadvantage in trying to cross-examine the State's witness as to the implications of these test results and the formation of her opinion based upon them. In no way can the error of admitting this evidence be said "probably" not to have affected the verdict, and thus be harmless. See *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869).

2. We find from the record that the failure of defendant in failing to secure, preserve and have tested his own blood sample was not the fault of the State, but was his own.

3. Appellant was not entitled to production of the prosecuting officer's personnel file, since it was not shown to have any relevance to appellant's guilt or innocence (*Lockwood v. State*, 184 Ga. App. 262 (361 SE2d 195); *Taylor v. State*, 172 Ga. App. 827 (324 SE2d 788)); nor that it was in any way exculpatory of the appellant in this case under *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215).

*Judgment reversed. Banke, P. J., and Beasley, J., concur.*

DECIDED APRIL 4, 1988 —
REHEARINGS DENIED MAY 16, 1988 —

*William C. Akins*, for appellant.
*Ralph T. Bowden, Jr., Solicitor, Richard R. Read, R. Andrew Fernandez, N. Jackson Cotney, Jr., Assistant Solicitors*, for appellee.