A92A1248. KERR v. THE STATE.

(423 SE2d 276)

BEASLEY, Judge.

Kerr was convicted of violating the Controlled Substances Act by possession of cocaine (OCGA § 16-13-30), driving under the combined influence of marijuana and cocaine (OCGA § 40-6-391 (a) (3)), and operating a motor vehicle without effective insurance (OCGA § 33-34-12 (b)).

Early one Saturday morning, Deputy Sheriff Freeman was on patrol and encountered a car driven by Kerr. The car's headlights were at high-beam, and Kerr did not dim them although the drivers of oncoming vehicles were flashing their bright lights. He was also driving slower than the normal flow of traffic. Freeman followed Kerr and observed him wait at a stop sign for approximately 20 to 30 seconds before moving.

For these reasons, Freeman stopped Kerr. Kerr said he had no insurance. Freeman noticed the odor of alcohol on Kerr's breath and that he was under the legal drinking age. After being given the *Miranda* warnings, Kerr stated he had consumed two beers.

Freeman asked Kerr to submit to a series of field sobriety tests. During the A-B-C test, Kerr omitted a couple of letters and misplaced others. When Freeman asked Kerr to take nine steps forward placing the heel of his front foot to the toe of his back foot and keeping his hands by his side, he wobbled as he went and kept steadying himself by raising his hands. When Freeman, in conducting the Horizontal Gaze Nystagmus test, asked Kerr to hold his head still and watch a pen which was being moved horizontally about six to eight inches from the tip of his nose, Kerr's eyeballs exhibited spasmodic

motions. Kerr had glassy eyes, was unsteady on his feet, and was very inattentive. Freeman reached the opinion that appellant was under the influence of alcohol or drugs to the extent that it was less safe for him to operate a motor vehicle.

Kerr agreed to take a breath test, and he registered .03 grams of alcohol in his system. Freeman believed Kerr was more intoxicated than was registered and he asked Kerr to take a urine test. Kerr complied. Freeman sealed the lid of the specimen jar with evidence tape and placed the jar in a sealed plastic bag. The evidence lockers in the sheriff's office were full, so Freeman locked the bag in a footlocker in the trunk of his patrol car, secured with a padlock that had one key kept in his exclusive possession. On Monday, Freeman gave the urine specimen to Clanton, the employee responsible for mailing blood and urine samples to the State Crime Laboratory.

Clanton testified that it is her procedure, when given a urine specimen, to wrap more tape around the container to avoid leakage. She testified that she used to place the specimens in either a ziplock bag, box, or large manila envelope for mailing, but currently used a box. Although she testified at trial that she could not remember how she packaged Kerr's urine specimen, she had testified at the hearing on a motion to suppress that she had put it in a ziplock bag, placed paper towels around it, and mailed it in a small box.

Solomons, who supervises the toxicology section of the GBI Division of Forensic Sciences, testified that the specimen jar containing Kerr's urine sample was received in a ziplock plastic bag in a large manila envelope sealed with tape. Although the screw-on lid of the specimen container was sealed with evidence tape, a small amount of the urine had leaked into the plastic bag in transit. At least three-fourths of the specimen was in the container. Solomons placed the specimen in cold storage with other samples.

Callahan, a forensic toxicologist, analyzed the urine specimen and testified that she found marijuana metabolites, cocaine, and benzoylecgonine (which is cocaine's metabolite). Appellant objected to this testimony under *Durden v. State*, 187 Ga. App. 154 (1) (369 SE2d 764) (1988); *Box v. State*, 187 Ga. App. 260 (370 SE2d 28) (1988), and *Camarata v. State*, 188 Ga. App. 41, 42 (1) (371 SE2d 885) (1988), on grounds that the witness had not analyzed the quantities of the controlled substances in the urine. Finding *Durden* and its progeny distinguishable, the trial court overruled this objection.

1. Appellant contends that the trial court erred in denying his motion to suppress the GBI report of the findings that the controlled substances were present in his urine sample.

He argues that Clanton's testimony at the earlier hearing, that she had placed the urine sample in a box, the testimony by GBI personnel that it had been received in an envelope, and the fact that the

contents had leaked in transit established a prima facie case of tampering during the chain of custody, entitling him to suppression of it and all evidence relating to it.

"The only burden on the state is to show with reasonable certainty that the evidence examined is the same as that seized and that there has been no tampering or substitution. [Cits.]" *Phillips v. State*, 167 Ga. App. 260, 263 (2) (305 SE2d 918) (1983). "[T]he burden is on the state to show with reasonable certainty that no tampering with the evidence has occurred, but where there is only a bare speculation of tampering it is proper to admit the evidence and let whatever doubt remains go to its weight." *Graham v. State*, 152 Ga. App. 233, 235 (1c) (262 SE2d 465) (1979). There being no evidence of tampering or substitution but merely of a leak of part of the sample, and no evidence that the leak affected a contamination of the sample, the trial court did not err in doing that here.

2. Appellant contends that the trial court erred in allowing the forensic expert to testify as to the degree of appellant's drug-related intoxication and his impairment to operate a motor vehicle when the exact numerical quantity of the drug was not stated in the forensic report.

Appellant relies upon *Durden* and its progeny. In *Durden*, the forensic expert testified that in order to issue a statement in a report that marijuana metabolites were found, there has to be at least 25 nanograms per milliliter present; a quantitative analysis of Durden's blood sample showed approximately 180 to 200 nanograms per milliliter present; this concentration indicates recent usage or that the person is a daily chronic abuser; such person would probably be very unsteady on his or her feet, his or her mind would tend not to be able to focus too clearly, and he or she would probably be glassy-eyed; and that level of marijuana, in combination with alcohol, would be detrimental to someone's driving ability.

The report submitted to Durden, pursuant to his OCGA § 17-7-211 request for copies of written scientific reports, stated only that marijuana metabolites had been found in his blood and urine. It did not state the results of the quantitative testing. Although Durden had no objection to the state's admitting evidence that marijuana metabolites were found, he did object to the evidence as to the quantity found and the effect of marijuana usage indicated or proved by such quantity. Noting that this omission in the report had disadvantaged defense counsel in his cross-examination of the forensic expert, and that OCGA § 17-7-211 would be emasculated if it were interpreted as not requiring the state to produce the results of the scientific testing simply by omitting them from the written report, the court agreed with Durden's arguments and reversed his conviction.

In this case, the forensic expert testified that unlike blood sam-

ples, urine specimens are tested as being either negative or positive for the particular substance without quantifying the amount.

Upon being posed hypothetical questions based on facts in evidence, the witness subsequently testified that where an individual with glassy eyes and a .03 grams of blood-alcohol concentration had responded to field sobriety tests in such a way that the officer conducting the tests had determined that he was under the influence, would be consistent with someone who was under the influence of alcohol and/or cocaine; and, the influence of those two substances would impair the person's ability to operate an automobile safely.

As recognized by the trial court, *Durden*'s holding that the results of the quantitative testing should not have been admitted in evidence is inapplicable here, because no quantitative testing was done. The trial court did not err in allowing the witness to answer the hypothetical question posed. In answering it, the forensic expert did not testify to the degree of appellant's intoxication and impairment to drive.

3. Appellant contends that the trial court erred in denying his motion for a directed verdict of acquittal on the charge of driving under the combined influence of alcohol and cocaine. He argues that such a charge requires a quantifying analysis to determine the degree of intoxication and impairment.

OCGA § 40-6-391 (a) (3) provides, "A person shall not drive or be in actual physical control of any moving vehicle while: . . . Under the combined influence of alcohol and any drug to the extent that it is less safe for the person to drive." *Howell v. State*, 179 Ga. App. 632, 634 (1) (347 SE2d 358) (1986). "There is no requirement that the person actually commit an unsafe act. [Cits.]" *Moss v. State*, 194 Ga. App. 181, 182 (390 SE2d 268) (1990). There is, however, the requirement that the alcohol and/or drugs ingested adversely affect one's ability to drive. This must be proved in order to convict under all subsections of section (a) except subsection (4). Although the legislature in OCGA § 40-6-392 has created evidentiary rules relating to measurable levels of alcohol in the blood, there are no similar statutory rules for controlled substances. *Camarata*, supra, also makes note of this.

Nonetheless, in *Durden* the forensic expert could testify that the degree of impairment, as manifested by the defendant's behavior, was caused by usage of the controlled substance, based on the amount used and the recency of usage, because there was a quantitative analysis of the substance in the defendant's blood. In this case, the officer testified to the degree of impairment as manifested by the defendant's behavior. The forensic expert could testify that the controlled substances, as well as the alcohol, were present in the defendant's urine. The statute does not require a certain amount to be shown.

Whether the impairment resulted from the combined influence of alcohol and drugs was a jury question. A rational trier of fact was authorized to find appellant guilty beyond a reasonable doubt. *Howell, supra.*

4. Appellant contends that the trial court erred in not directing a verdict of acquittal on the charge of possession of cocaine.

He argues that where the charge is based upon a urine sample the contents of which cannot be quantified, the urine sample itself is inadmissible, all evidence relating to it should be suppressed, and the court should direct a verdict of acquittal.

As previously stated, in *Durden* the forensic expert testified that in order to issue a report that marijuana metabolites were found in a blood sample, there has to be at least 25 nanograms per milliliter present. In this case, appellant was charged with possession of cocaine based on the fact that his urine sample tested positive for that substance. *Durden* does not involve issues relating to any quantifying standard for determining the presence of cocaine in a urine specimen. The record in this case does not support appellant's arguments.

*Judgment affirmed. Birdsong, P. J., and Andrews, J., concur.*

DECIDED SEPTEMBER 8, 1992 —
RECONSIDERATION DENIED SEPTEMBER 29, 1992 — 

*James E. Hardy II,* for appellant.
*Garry T. Moss, District Attorney, C. David Turk III, Assistant District Attorney,* for appellee.