## A95A2334. McDANIEL v. THE STATE.
(470 SE2d 719)

ANDREWS, Judge.

David Allen McDaniel, convicted of obstruction of an officer, appeals, contending the trial court erred by forcing him to waive his demand for trial and granting the State's motion in limine. We affirm.

McDaniel was charged, via accusation, with obstruction of a law

---

enforcement officer in that he refused "to obey the lawful commands of Officer W. C. Pearson." He filed a demand for trial pursuant to OCGA § 17-7-170 (a), and the case was called for trial on January 30, 1995, during the next succeeding regular term of court. On January 31, 1995, a mistrial was declared because the jury could not reach a verdict. The next day, the case was again called for trial, but defense counsel announced that he was not ready because he just learned at 8:30 that morning, via a message on his telephone answering machine, that the case was being called for trial. Defense counsel explained that he was surprised by this last minute notice because he was advised (apparently by the trial court) after the mistrial that he would have at least 24-hour notice before the case would be called for trial; that he did not have time to collect or prepare evidence that was uncovered during the first trial, and that he would not have time to issue subpoenas for certain witnesses who were released after the first trial. The trial court responded by offering defense counsel a continuance until the next day, which defense counsel declined, explaining that he would need more time to prepare. The trial court gave defense counsel an option. He could either go forward with trial or ask for a continuance. Defense counsel opted for a continuance, after which he affirmed (in open court) that McDaniel waived his demand for trial.

On March 13, 1995, the second jury trial began. Viewed in favor of the verdict, the evidence revealed that McDaniel contacted police authorities about 1:00 a.m. on November 3, 1994, complaining about violations of a recently enacted noise abatement ordinance aimed at ongoing noise from a food storage facility near the McDaniels' home. Gwinnett Officer William C. Pearson responded to the call and found McDaniel standing in the driveway outside his home. Officer Pearson lowered the patrol car's window, and McDaniel gave him a copy of the ordinance, complaining that the nearby food storage facility was not in compliance. Officer Pearson was familiar with the ordinance and residents' complaints about late night noise at the food storage facility.

He advised McDaniel that he could not issue a citation because there was no one at the food storage facility to accept service. Officer Pearson explained that he would report the matter to other law enforcement authorities in an effort to resolve the problem during normal business hours. Stymied and irate, McDaniel asked Officer Pearson to call the food storage facility's emergency number. He wanted the nuisance abated and the proprietor charged for violating the ordinance. Officer Pearson refused, explaining that violation of the noise ordinance was not an emergency. McDaniel then indignantly asked for Officer Pearson's name and badge number, in response to which the officer ordered McDaniel to produce some identification. McDan-

iel advised Officer Pearson that "he didn't have any [and that] he'd have to go get his mother." Officer Pearson responded, " 'Sure, fine.' " McDaniel went into the house, and moments later, an elderly woman emerged and approached the patrol car where Officer Pearson was still seated. McDaniel remained on "the stoop towards the house." The following testimony memorializes the events which ensued:

"[STATE'S ATTORNEY]. Q. Okay. And [did McDaniel] remain [at the stoop] when she came to your car? [OFFICER PEARSON]. A. For a little while. . . . Q. Okay. And what did she say when she came out to your car? A. She came out and . . . walked up to my window and my window was all the way down. She walked up to my car. I said, 'How are you doing? I'm Officer Pearson. Can I help you?' She said, 'Well, what's the problem with the noise thing?' I said, 'Ms. Mc-Daniel, . . . there's no way I can enforce this ordinance at this time of day. There's no one there.' And she again asked me, as [did] her son, about the emergency number. I explained to her the same thing I explained to him, that's not what that number is designed for. Our dis-patchers will not call that number unless there is a valid emergency, an alarm or a break-in or a fire. That's their requirements. We cannot make them contact. We do not keep phones in the cars. Q. Okay. Was [McDaniel] listening to this? A. He heard part of it because he had started walking towards the car by that time. Q. And what did he say when he walked back to the car? A. He told his mother to make sure I go over there and do something and to make sure she got my name and badge number. Q. Okay. What did you say? A. I just continued to talk to his mother. I was continuing trying — I could — I can under-stand her problem. I sympathize with her. I did not hear [the noise that was allegedly emanating from] the trucks [at the food storage fa-cility] from my personal experience, but I can understand. If it was a violation, that I would do whatever I could. But if there was no one there, I couldn't do anything. Q. Could you hear the trucks from where you were in front of their house? A. Not from my observa-tion. . . . Q. Did . . . you hear Mrs. McDaniel say anything to [Mc-Daniel]? A. She turned around and told him that she was handling it, to go back in the house. Q. Okay. Did he? A. He did the first time, yes. Q. And did he come back? A. Yes, ma'am. Q. What did he do when he came back? A. He came back out and he still was yelling at his mom, 'I want his name and badge number. Make sure he doesn't leave before he does something about those trucks.' And she turned around to him again and told him, 'David, go in the house before you get in trouble.' Q. Then what happened? A. He just kept standing outside and just kept going on and I was talking to her and I said, 'Mrs. Mc-Daniel, excuse me,' and I stepped out of my [patrol] car. Q. Did you knock her over? A. I did not knock her over. She's an elderly lady, I could see that. There is no way in the world I'm going to jump out of

that car and knock anyone over. Because there was no need for me to get out of the car in that area. If I wanted to be out of the car, I'd got out of the car when I arrived on the scene. I never got out of the car on purpose. Q. Okay. So why did you get out of the car then? A. To talk to [McDaniel], to explain to him that he needs to calm down, go in the house, and let his mother handle the situation. Q. Why did you prefer the mother to handle the situation [rather than] him? A. Because, obviously, she was civil about the situation. Q. Okay. Did you notice anything going on around and about the neighbors' houses as [McDaniel] continued to stand out front and yell towards you? A. I saw one house directly across the street from the McDaniel's residence, . . . the lights come on toward the front of the house. . . . Q. Well, did that . . . lead you to believe anything when you saw the neighbor['s] lights go on? A. Yes, ma'am. I just felt the neighbors were maybe being disturbed, that they were taking notice of the incident. Q. And what did you . . . do when you got out of the car? A. I went over to [McDaniel] and I told him, I said, 'Sir, I've asked you several times to go in the house and let your mother deal with this situation. If you say another word, I'll arrest you for disorderly conduct.' Q. And what did he do then? A. He came over toward me with a flashlight, turned it on in his face and said, 'One more word,' as if to mock me. Q. And what did you do then? A. I arrested him for disorderly conduct. . . . Q. . . . Okay. . . . And what did he do in response to your physically placing him under arrest? A. He said he wasn't going anywhere [and] a struggle ensued. We struggled for at least two to three minutes, me trying to get him under control. Q. Now [defense counsel] said . . . in his opening statement that you seized [McDaniel] or you grabbed him first. Is that right? A. Yes, ma'am. Q. Okay. Why did you seize or grab him? A. Well, I grab everybody I arrest."

Then, McDaniel's mother went to assist her son after her pleas for the men to stop fighting were not heeded. Neighbors responded to the elderly woman's call for help. In the meantime, Officer Pearson managed to activate the emergency signal on his portable radio. Other officers appeared and calmed the disruption. By then, McDaniel was in police custody, his mother had bloodied Officer Pearson's nose, and the elderly woman was on the ground, complaining of injuries. She was later taken (via ambulance) to a hospital where she was treated and released.

McDaniel was found guilty of obstruction of a law enforcement officer in that he refused "to obey the lawful commands of Officer W. C. Pearson."

1. McDaniel claims the trial court erred in forcing him to waive his demand for trial.

This Court is a court for the correction of legal errors and has no jurisdiction to address issues that are raised for the first time on ap-

peal. *Thomason v. State*, 215 Ga. App. 189, 190 (4) (450 SE2d 283). A motion for discharge and acquittal is the remedy for the claim that the court forced McDaniel to waive his demand for trial. McDaniel, however, did not file a motion for discharge and acquittal below. Accordingly, this enumeration presents nothing for our review. See *Pope v. State*, 214 Ga. App. 458, 459 (1) (448 SE2d 54).

2. Prior to trial, the court considered and granted the motion in limine of the State to preclude introduction of, or reference to, nine different categories of documents, all of which involved internal affairs investigations of Officer Pearson, his personnel evaluations, internal department memorandums, training evaluations and other similar matters.

In granting the motion, the court held that "[a]t this point in time I don't see how the officer's internal records and assessment or the performance would be relevant to the trial of this case. . . . I don't know what will come up in the trial or what you propose to show by some of these witnesses later. I'll just have to reserve my ruling at the time the thing comes up. But at this point in time I don't believe the internal records assessing the officer would be admissible in court. . . . [I]*f his credibility comes into play, if you have some evidence regarding his credibility, I'm not denying that.* But I say that the internal records that you have they would not be admissible." (Emphasis supplied.)

As acknowledged by the dissent, "[w]hen the defense seeks to discover the personnel files of an investigating law enforcement officer, some showing of need must be made." *Cargill v. State*, 255 Ga. 616, 638 (23) (a) (340 SE2d 891) (1986). The "need" which must be shown is also subject to the general rules of evidence, including a showing of relevancy. *Durden v. State*, 187 Ga. App. 154, 158 (3) (369 SE2d 764) (1988); *Lockwood v. State*, 184 Ga. App. 262, 263 (2), 264 (361 SE2d 195) (1987).

In order to impeach a witness and thereby attack his credibility, one may disprove "the facts testified to by him." OCGA § 24-9-82. No attempt was made by McDaniel to so impeach Pearson. Neither was any showing made that any of the documents disallowed contained any contradictory statements "previously made by [Pearson] as to matters relevant to his testimony and to the case." OCGA § 24-9-83; *Jones v. State*, 257 Ga. 753, 759 (1) (a) (363 SE2d 529) (1988); *Campbell v. Cozad*, 207 Ga. App. 175, 176 (2), 178 (427 SE2d 515) (1993).

There is no contention that Officer Pearson had ever been convicted of a crime involving moral turpitude, *Vincent v. State*, 264 Ga. 234 (442 SE2d 748) (1994), leaving for consideration impeachment by "evidence as to his general bad character." OCGA § 24-9-84.

The latter category is the only one arguably applicable to the documentary evidence subject to the court's ruling. Even so consider-

ing it, however, the proffered information was, at best, "related solely to specific bad acts and not to the general bad character of the [witness]." *Heaton v. State*, 214 Ga. App. 460, 461 (2) (448 SE2d 49) (1994). Such specific bad acts are not admissible as impeachment. *Wetta v. State*, 217 Ga. App. 128, 130 (3) (456 SE2d 696) (1995); *Heaton*, supra; *Davis v. State*, 209 Ga. App. 187, 190 (5) (433 SE2d 366) (1993).

Therefore, the proffered evidence was not admissible and McDaniel was not deprived, on this basis, of a full and sifting cross-examination. There was no error.

*Judgment affirmed. Beasley, C. J., Birdsong, P. J., Pope, P. J., Johnson, Blackburn and Smith, JJ., concur. McMurray, P. J., and Ruffin, J., dissent.*

McMURRAY, Presiding Judge, dissenting.

I, respectfully, dissent as I believe the trial court erred in granting the State's motion in limine, thereby preventing defendant from introducing evidence that Officer Pearson abused his authority during other incidents while performing his law enforcement duties.

The trial court refused to allow at least a dozen internal affairs' complaints against Officer Pearson indicating prior incidents where the officer was unable to exercise restraint while performing his duties. One of these reports reflects an incident at Shallowford Hospital in 1991 where Officer Pearson threatened to arrest an emergency room physician for obstruction of an officer because the doctor "didn't act as the officer thought he should. . . ." Defense counsel offered this proof not just for impeachment purposes (as inferred by the majority), but also to show "a pattern of conduct by the officer." It is my view, that the proffered evidence was relevant to defendant's sole defense, i.e., that defendant did not obstruct Officer Pearson, but that the officer overreacted by exiting the patrol car, confronting defendant and threatening defendant with arrest if he uttered "another word."[1]

While specific acts are generally not admissible to prove reputation or character, such evidence is admissible to prove habit, course

---

[1] "The Georgia Supreme Court held in *Cargill v. State*, 255 Ga. 616, 638 (23a) (340 SE2d 891) (1986), that when the defense seeks to discover the personnel file of a law enforcement officer, some showing of need must be made." *Houston v. State*, 217 Ga. App. 279, 280 (2), 281 (456 SE2d 766). In the case sub judice, defendant did not seek examination or disclosure of Officer Pearson's personnel file, he sought to introduce evidence collected during an independent investigation by defense counsel. These circumstances distinguish the case sub judice from cases where the defense was unable to point to specific proof casting doubt upon the officer's credibility. See *Durden v. State*, 187 Ga. App. 154, 158 (3) (369 SE2d 764); *Lockwood v. State*, 184 Ga. App. 262 (361 SE2d 195), rev'd on other grounds, 257 Ga. 796 (364 SE2d 574); *Taylor v. State*, 172 Ga. App. 827 (1) (324 SE2d 788); and *Jinks v. State*, 155 Ga. App. 925 (2) (274 SE2d 46).

of conduct or bent of mind. *Milton v. State*, 245 Ga. 20, 24-26 (262 SE2d 789); *Little v. State*, 164 Ga. 509, 510 (1) (139 SE 37). See *Stripling v. Godfrey*, 143 Ga. App. 742 (2) (240 SE2d 145); *Sams v. Gay*, 161 Ga. App. 31, 32 (1), 33 (288 SE2d 822). The rationale is that "[h]abit in the usual sense is more probative of the doing of a particular act out of habit than is character, because habit is more specific." (Footnote omitted.) Thomas F. Green, Jr., Georgia Law of Evidence (4th ed.), p. 136, § 67. In the case sub judice, I believe the evidence underlying prior complaints against Officer Pearson, particularly the incident at Shallowford Hospital, was relevant because it tended to support defendant's claim that Officer Pearson was prone to overreact to volatile situations and abuse his police authority. See *Milton v. State*, 245 Ga. 20, 25, supra; *Gibson v. State*, 176 Ga. 384 (3) (168 SE 47). I believe that holding otherwise is contrary to the well-worn principle that " '[t]his court stands pledged, by its past history, for the abolition, to the extent of its power, of all exclusionary rules which shut out facts from the jury which may serve, directly or remotely, to reflect light upon the transaction upon which they are called upon to pass.' *Baker v. State*, [142 Ga. 619, 623 (83 SE 531)]." *Milton v. State*, 245 Ga. 20, 25, supra.

I am authorized to state that Judge Ruffin joins in this dissent.

DECIDED MARCH 15, 1996 —
RECONSIDERATION DENIED MARCH 29, 1996.

*Clifford H. Hardwick*, for appellant.

*Gerald N. Blaney, Jr., Solicitor, Richard E. Thomas, Rosanna M. Szabo, Assistant Solicitors*, for appellee.